UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLIAM LOCURE, JR.                                          CIVIL ACTION

VERSUS                                                              NO. 14-1318

CAROLYN W. COLVIN, ACTING                    SECTION "I" (2)
 COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, William Locure, Jr., seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act.  42 U.S.C. §§ 405(g), 1381a.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Locure filed his application for SSI on November 28, 2011, alleging disability beginning July 24, 1991, due to burns over 52 percent of his body.  (Tr. 98, 120, 124).  After his claim was denied at the agency level, he requested a hearing before an Administrative Law Judge (ALJ), which was held on September 18, 2012.  The ALJ issued a decision denying the application for benefits on February 5, 2013.  (Tr. 12-21).  The Appeals Council denied plaintiff's request for review on April 17, 2014 (Tr. 1-3),

and the ALJ's decision became the Commissioner's final decision for purposes of this court's review.

Plaintiff filed a timely memorandum of facts and law.  Record Doc. No. 14. Defendant filed a timely reply memorandum.  Record Doc. No. 15.

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   Substantial evidence does not support the ALJ's finding that Locure's burns with skin grafts do not cause any limitations.

B.   Substantial evidence does not support the ALJ's finding that plaintiff is capable of making simple, work-related decisions and routine workplace changes, and these findings are based on a legally improper medical opinion evaluation.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.   Locure has a severe impairment of major depressive disorder with psychosis.

2.   He has a history of burns and drug abuse, in remission by testimony.  There is no medical evidence that the history of burns affects his functioning. Plaintiff's history of burns is a nonsevere impairment.

3.   He does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, App. 1, including specifically Listing 12.04 for affective disorders.

4.   Locure has the residual functional capacity to perform a full range of work at all exertional levels, with the following nonexertional limitations:  the work environment must be free of fast-paced production requirements.  He could make simple work-related decisions and routine workplace changes,

have occasional direct interaction with the public, co-workers and supervisors, and concentrate for two-hour blocks of time.

5.   Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

6.   He has no past relevant work.

7.   Considering Locure's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that he can perform, such as janitor and cleaner, groundskeeper and dishwasher.

8.   Plaintiff has not been under a disability, as defined in the Act, since November 28, 2011, the date of his application.

(Tr. 14-20).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence. Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2012). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[1]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Locure testified that he attended the eleventh grade in school and did not receive a GED or any vocational training. He stated that he was incarcerated two years ago on a drug charge and was released in November 2011. He said he no longer has a drug problem and has not used illegal drugs since 2007. (Tr. 29).

6

Plaintiff stated that he last held a full-time job in 1986.  He testified that it was hard to get a job and he could not keep a job because everyone was against him.  He said he did not look for a job after he was released from prison in 2011.  He stated that he was just trying to get his medicine at that time because he was having problems at home.  He said he receives mental health treatment from Dr. Calhoun at Metropolitan Human Services.  (Tr. 30).  He testified that he talks to Dr. Calhoun once a month when he picks up his medicine and that he had an appointment to see Dr. Calhoun two days after the hearing.  He said he is also treated at Daughters of Charity, but had not been there in a few months because his health care provider was sick the day of his last appointment and he had to reschedule.  He testified that, even with medication, he still sees things every night when he goes to bed.  (Tr. 31).  He said he sees people crawling and walking on the walls.

Locure testified that he cannot work with people because they talk too much and irritate him a lot.  He said he did not receive mental health treatment in prison because it was not available at Rayburn Correctional Center where he was incarcerated.

Plaintiff stated that he lives with his mother.  He said that, on a typical day, he watches television and sleeps.  (Tr. 32).  He testified that he sleeps a lot during the day because his medicine makes him tired.  He said he does not focus or concentrate well because he gets irritated, so he stays in his room.

Locure stated that he hears voices during most of the day and especially at night when he goes to bed. (Tr. 33). He said the voices sometimes say, "burn, burn." He testified that he still has scars from his burns in the 1990s. He stated that the scar tissue pulls and hurts when he raises his arms. He said that his skin grafts cause tightness in his skin where he was burned over 55 percent of his body.

Plaintiff testified that he does not get tested for drugs and no longer has a problem with alcohol because he does not drink at all. (Tr. 34-35). His attorney pointed out that Locure had a negative drug test on admission to a hospital in February 2012. (Tr. 37).

C.   Vocational Expert Testimony

A vocational expert, Deborah Bailey, testified at the hearing. The ALJ noted that plaintiff had no past relevant work. The ALJ posed a hypothetical of a person with the same age, education and past work experience as Locure who has the residual functional capacity for a full range of work at all exertional levels, but has nonexertional limitations of a work environment free of fast-paced production requirements; with only simple work-related decisions and routine workplace changes; only occasional direct interaction with the public, co-workers and supervisors; and the ability to concentrate for two-hour blocks of time. Bailey testified that such a person could perform medium, unskilled positions, such as janitor and cleaner, groundskeeper and dishwasher, that are available in significant numbers. (Tr. 36).

8

The ALJ modified the hypothetical to add an inability to sustain sufficient concentration, persistence and pace to perform work on a continuing basis for eight hours per day, five days per week.  The vocational expert testified that such a person could not perform any competitive work.  Plaintiff's attorney had the opportunity to, but did not, ask any questions of the vocational expert. (Tr.  37).

D.     Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 14-19).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.     Plaintiff's Appeal

1.     Substantial evidence supports the ALJ's finding that Locure's burns with skin grafts do not cause any limitations.

The ALJ proceeded through the entire sequential evaluation and held at the fifth step that plaintiff is not disabled because he has the residual functional capacity to perform jobs that are available in the national economy.  At step two of the analysis, the ALJ found that Locure has a severe impairment of major depressive disorder with psychosis.  She also found that he has a history of burns, but that no medical evidence suggests that this history affects his functioning.  Therefore, the ALJ held that plaintiff's history of burns is a nonsevere impairment.

Locure contends that the record supports his subjective complaints of pain and inability to work in the heat or sun as a result of his history of burns because his skin grafts do not perspire and they cause tightness, pain and limited movement of his shoulders when he tries to lift objects.  He argues that, in determining that the burns and grafts are nonsevere, the ALJ erred by failing to evaluate his credibility.  He asserts that he was prejudiced by these errors because all of the medium exertional jobs that the vocational expert identified require frequent lifting and carrying, and the job of groundskeeper also requires working outdoors.

In the Fifth Circuit, "[a]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902 n.1 (5th Cir. 2010) (quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)); accord Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985).  The ALJ in this case cited the relevant standard and explained why she found that burn history is not a severe impairment.

At the second step of the sequential evaluation, the ALJ determines only the "medical severity" of the claimant's medically determinable impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  When the ALJ proceeds beyond step two to find at a subsequent step that a claimant is not disabled, plaintiff's argument that the ALJ failed at step two to find that a particular impairment is severe

is inapposite because the ALJ did not [deny] plaintiff's benefits based on a finding that [his] impairments are not severe.  See Chapparo v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application of Stone standard irrelevant to disposition of case if outcome of case [did] not turn on issue of severity); see also Shipley v. Director of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987).  The ALJ's report contains a statement of the Stone standard and a determination that as it applied to this case, [one of claimant's several alleged impairments] is a severe impairment. . . .  The ALJ then proceeded to the next step of the sequential evaluation and assessed whether an impairment or a combination of plaintiff's impairments met or exceeded the severity of the impairments listed in the appendix.  See 20 C.F.R. § 404.1594(f)(2).  In the absence of a "non-severe" finding as to any one of plaintiff's impairments and a decision to [deny] plaintiff's benefits based on a "non-severe" finding, plaintiff cannot complain that any prejudice resulted from the ALJ's performance at this stage in the evaluation.  See Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) (decision will not be reversed where claimant makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002); see

also Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012) ("any error by the ALJ in not

following the procedures set out in Stone [at step two] is harmless" when the ALJ finds

at step five that plaintiff is not disabled by his severe impairments); Bradshaw v. Astrue,

No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing

Robinson v. Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915

F.2d 151, 154 n.1 (5th Cir. 1990); Chapparo, 815 F.2d at 1011) ("In more recent cases,

the Fifth Circuit has found no merit to claimants' arguments of ALJ error arising out of

the failure to correctly apply or state the Stone standard where the sequential evaluation

process proceeds past step 2.").  No prejudice occurs in these cases because "once a

severe impairment is determined to exist, all medically determinable impairments [including nonsevere ones] must be considered in the remaining steps of the sequential analysis." Burgette v. Colvin, No. 12-1155, 2013 WL 3776291, at *3 (W.D. La. July 15, 2013) (citing 20 C.F.R. §§ 404.1523, 404.1545).

Having found that Locure had one severe impairment, the ALJ proceeded through the sequential evaluation, considered all of the evidence concerning plaintiff's medically determinable impairments, assessed his residual functional capacity and found at the fifth step that he can perform work that is available in the national economy. The ALJ's failure to find at step two that Locure's history of burns is not a severe impairment is irrelevant and non-prejudicial to him.

"Because the ALJ did not summarily dispose of Plaintiff's claims at Step Two, but instead determined that Plaintiff had at least one severe impairment and proceeded to Step [five] to determine that Plaintiff was not disabled, the proper focus here is whether substantial evidence supports the ALJ's residual functional capacity . . . assessment and ultimate determination that Plaintiff was not disabled." Lavery v. Astrue, No. V-11-3, 2012 WL 3276711, at *5 (S.D. Tex. Aug. 8, 2012) (citing Chaparro, 815 F.2d at 1011) (footnote omitted).

Even if the court were to review the ALJ's step two determination, substantial evidence supports her finding that Locure's history of burns is not a severe impairment. Although he alleges an onset date in 1991, medical records from the years immediately

following plaintiff's burn injuries are not substantial evidence regarding whether he suffered disabling functional impairments that have lasted or can be expected to last for a continuous period of 12 months before or after November 28, 2011, when he applied for SSI.[2]  The relevant time period for establishing disability consists of the 12 months before November 28, 2011, through the date of the ALJ's decision.  The ALJ nonetheless considered Locure's complete medical history.  (Tr. 12).

A claimant's own reports of his symptoms, including pain, fatigue and dizziness, are insufficient to establish a medical impairment.  Subjective complaints like these must be corroborated by objective medical evidence.  20 C.F.R. §§ 404.1528(a), 416.928(a), 404.1529(a), 416.929(a); Palomo v. Barnhart, 154 F. App'x 426, 429-30 (5th Cir. 2005) (citing 20 C.F.R. §§ 416.908, 404.1508; Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1994); Wren v. Sullivan, 925 F.2d 123, 128-29 (5th Cir. 1991)); Ukolov v. Barnhart, 420 F.3d 1002, 1005-06 (9th Cir. 2005); Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996); Houston v. Sullivan, 895 F.2d 1012, 1016 (5th Cir. 1989).

Locure asserts that the Rayburn Correctional Center medical records show that he suffered overheating and dizziness due to working in the heat on May 31, 2009, while

---

[2]"Claimants applying to the SSI program may not receive payments for a period predating the month in which they apply for benefits."  Rosetti v. Shalala, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335) (emphasis added); accord Brown v. Apfel, 192 F.3d 492, 495 n.1 (5th Cir. 1999).  "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid."  Hector v. Barnhart, 337 F. Supp. 2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; Brown, 192 F.3d at 495 n.1).

he was on restricted duty, and that he asked to be allowed not to work in the sun.  The records do not reveal what type of duty restrictions were in place.  On March 23, 2009, the prison doctor provided Locure with a six-months' supply of sunscreen, indicating that he could go out in the sun if protected by sunscreen.  The doctor also noted that plaintiff had good range of motion in his extremities.  (Tr. 210).

The prison medical records do not indicate that plaintiff's overheating and dizziness on May 31, 2009 were caused by his burns or skin grafts, or that this was more than an isolated incident.  The doctor who saw Locure on June 11, 2009 in response to his May 31, 2009 sick call request noted nothing remarkable on physical examination.  The physician did <u>not</u> recommend that plaintiff stay out of the sun.  He prescribed an increased dose of Vasotec[3] for Locure's high blood pressure and advised him to avoid salt and increase his water intake.  (Tr. 205-06).

The only other mention of heat-related illness in any of the medical records in the administrative record is on February 26, 2010.  Locure reported that he became overheated while sleeping at the prison, jumped up, felt dizzy and fell to his knees.  The nurse who responded to the sick call noted that plaintiff was sweating, was dressed in heavy clothes and had a high blood pressure reading.  When the doctor was notified, he

---

[3]Vasotec (generic name:  enalapril) is an angiotensin-converting enzyme inhibitor used alone or in combination with other medicines to treat high blood pressure, heart failure and left ventricular dysfunction. <u>PDRhealth</u> (PDR Network, LLC), http://www.pdrhealth.com/drugs/vasotec (visited Mar. 9, 2015).

told Locure to walk, exercise more, avoid salt, increase his water intake and take his blood pressure medicine as directed.  (Tr. 195).  There is no indication that this isolated episode of overheating was related to plaintiff's burns or skin grafts.

Throughout his three years and four months in prison, the medical records are replete with references to plaintiff's non-compliance with medications and with repeated advice from his doctor to exercise.  The prison records support the ALJ's finding that Locure's history of burns was a slight abnormality with such minimal effect on him that it would not be expected to interfere with his ability to work, i.e., that it was nonsevere.

The post-prison medical records also substantially support this finding.  Locure presented at an urgent care clinic at the Medical Center of Louisiana–New Orleans ("MCLNO") on December 2, 2011, three days after he was released from prison and filed for SSI.  He complained of a history of low back pain for two years (the prison medical records do not support this history) and stated, "I want to get back on disability."  On physical examination, he had elevated blood pressure, no tenderness in his back and a negative straight leg raising test.  The doctor opined that no emergency intervention was needed, prescribed Mobic[4] for back pain and advised plaintiff to follow up with the ambulatory patient clinic.  (Tr. 270-71).

---

[4]Mobic (generic name:  meloxicam) is a nonsteroidal anti-inflammatory drug used to treat osteoarthritis and rheumatoid arthritis.  Id., http://www.pdrhealth.com/drugs/mobic (visited Mar. 12, 2015).

Locure did not seek further medical treatment until February 6, 2012, when he was admitted through the MCLNO emergency room and transferred to East Jefferson General Hospital for suicidal ideation and possible audio hallucinations.  The emergency room physician's note indicates that Locure had been noncompliant with all medications for several months.  Other than elevated blood pressure, plaintiff's physical examination was normal.  (Tr. 285).  On discharge from the hospital on February 10, 2012, he received prescriptions for medications to treat his high blood pressure, elevated cholesterol and mental illness.  Nothing was prescribed for pain and no restrictions were placed on any activity.  (Tr. 301, 304).

Locure's statement in his Function Report that he cannot stay in the sun too long because of his burns (Tr. 132), his testimony that the skin grafts pull and hurt when he raises his arms, and his statement to the consultative psychologist, Christine B. Powanda, Ph.D., on October 12, 2012, that his skin grafts cause pain and limited motion in his shoulders (Tr. 348) are unsupported by any medical evidence to establish the degree of functional limitation, if any, caused by the skin grafts.  Even if Locure's statements are accurate, he fails to establish by substantial evidence that the burns and skin grafts are more than slight abnormalities having such minimal effect that they would not be expected to interfere with his ability to work.

Locure argues that the ALJ failed to mention the opinion of a non-examining physician, Emily Eisenhauer, M.D., who reviewed his medical records on December 28,

16

2011, that his medically determinable impairment of burns could reasonably be expected to produce pain or other symptoms.  However, Locure himself fails to mention that Dr. Eisenhauer concluded that his allegations of pain and other symptoms were only partially credible, that the level of severity he alleged was not supported by the medical evidence and that his burns were <u>non</u>severe.  (Tr. 42).  Dr. Eisenhauer's opinion is additional evidence in support of the ALJ's step-two severity finding.

Accordingly, this assignment of error is meritless.

2.    Substantial evidence supports the finding that plaintiff can make <u>simple, work-related decisions and routine workplace changes.</u>

At the fourth step of the sequential analysis, the ALJ found that Locure has the residual functional capacity to perform a full range of work at all exertional levels, with certain nonexertional limitations:  the work environment must be free of fast-paced production requirements and he can make simple work-related decisions and routine workplace changes; have occasional direct interaction with the public, co-workers and supervisors; and concentrate for two-hour blocks of time.  Plaintiff bears the burden of proving that he suffers from a disability under the first four parts of the sequential inquiry.  <u>Perez</u>, 415 F.3d at 461.

Locure argues that substantial evidence does not support the finding that he can make simple work-related decisions and routine workplace changes, and that this finding is based on a legally improper medical opinion evaluation.  He contends that the ALJ

17

erroneously accorded great weight to the opinions of his treating psychiatrist, Andrew

Calhoun, M.D., when Dr. Calhoun did not render an opinion regarding plaintiff's

functioning, and that the ALJ also erred by affording only some weight to the functional

findings of the consultative examining psychologist, Dr. Powanda.  Plaintiff argues that

the ALJ failed to weigh Dr. Powanda's more specific findings about his functioning,

which he contends are consistent with Dr. Calhoun's treatment records and the evidence

as a whole, and failed to explain the reasons for the particular weight she gave to each

doctor's findings.  Locure asserts that the ALJ's mental residual functional capacity

findings are contrary both to the GAF score of 50[5] assigned by Dr. Calhoun and to Dr.

Powanda's opinions rendered on a Medical Source Statement of Ability to Do Work-

Related Activities (Mental) that plaintiff has "marked" limitations in his ability to make

judgments on simple work-related decisions and to respond appropriately to usual work

---

[5]The Global Assessment of Functioning ("GAF") is a 100-point scale used to report the clinician's judgment of the individual's overall level of psychological, social and occupational functioning.  Tuck v. Astrue, No. 1:07CV-00084-EHJ, 2008 WL 474411, at *4 n.5 (W.D. Ky. Feb. 19, 2008) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")).

> "Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning."  "The description of each 10-point range in the GAF Scale has two components:  the first part covers symptom severity, and the second part covers functioning."  "The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range."  Notably, when a patient's symptoms severity and level of functioning are discordant "the final GAF rating always reflects the worst of the two."  Thus, the GAF rating . . . may reflect plaintiff's symptoms severity, his level of functioning, or both.

Tuck, 2008 WL 474411, at *4 n.5 (quoting DSM-IV-TR at 32-33) (emphasis added); accord Lane v. Colvin, No. C13-5658 MJP, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014).

situations and to changes in a routine work setting.  (Tr. 345-46).  Plaintiff argues that the ALJ improperly "played doctor" by making her own medical assessments.

The mere diagnosis of an impairment, even if it is a severe impairment under Social Security regulations, does not establish a claimant's disability.  Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991).  Plaintiff "'must show that [he] was so functionally impaired by [his diagnosed impairments] that [he] was precluded from engaging in any substantial gainful activity.'" Bordelon, 281 F. App'x at 421 (quoting Hames, 707 F.2d at 165); accord Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992).

As previously noted, a claimant's own reports of his symptoms are insufficient to establish a medical impairment, and subjective complaints must be corroborated by objective medical evidence.   20 C.F.R. §§ 404.1528(a), 416.928(a), 404.1529(a), 416.929(a); Quijas v. Astrue, 298 F. App'x 391, 393 (5th Cir. 2008) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)); Palomo, 154 F. App'x at 429-30; Ukolov, 420 F.3d at 1005-06; Craig, 76 F.3d at 592; Houston, 895 F.2d at 1016. Subjective complaints may be discounted when the alleged symptoms are not consistent with the objective evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009);

Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008) (citing Anthony, 954 F.2d at 295); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

Determination of a claimant's RFC is the ALJ's sole responsibility, and such an assessment is not a medical opinion.  Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012) (citing Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995)); Joseph-Jack v. Barnhart, 80 F. App'x 317, 318 (5th Cir. 2003) (citing 20 C.F.R. §§ 416.946, 416.927(e)).

Based on Dr. Calhoun's assessment of a GAF score of 50, which denotes serious symptoms or difficulties in functioning,[6] plaintiff argues that the ALJ should have assessed more severe limitations in his work-related mental abilities.  In making this argument, Locure ignores Dr. Calhoun's narrative descriptions of his symptoms as mild at every visit and as "much improved" after plaintiff began treatment and medications. (Tr. 314-17).  Plaintiff also ignores Dr. Powanda's assignment of a GAF score of 53, which indicates only moderate symptoms or difficulties in functioning, while he relies on the "marked" limitations that Dr. Powanda listed in her Medical Source Statement.

---

[6]

A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

Castillo v. Colvin, No. H-12-3512, 2014 WL 897798, at *5 n.2 (S.D. Tex. Mar. 6, 2014) (quoting DSM-IV-TR at 34).

(Tr. 345-46).  It appears that each doctor's assigned GAF score conflicts to some degree with his or her descriptions of Locure's mental symptoms and/or functioning.  It is entirely the ALJ's province to resolve such conflicts.  <u>Luckey</u>, 458 F. App'x at 324.

Notably, both the American Psychiatric Association and the Commissioner have recently decided that GAF scores are not helpful in either medical or disability decision-making.  The American Psychiatric Association deleted the GAF scale from its revised <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition:  DSM-5</u> (5th ed. 2013).  In the same year, the Commissioner issued internal guidance for its adjudicators regarding the limited usefulness of GAF scores, which will continue to appear in medical records that were completed before DSM-5 was published.

> GAF scores have been deemed unreliable.  "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics[7] in routine practice."  To clarify the appropriate reliance on GAF scores, the Social Security Administration ("SSA") released an Administrative Memorandum [sic] (identification number AM-13066, effective date July 22, 2013)[8] that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment Functioning (GAF) ratings when assessing disability claims involving mental disorders." (ECF No. 11-2 at 6.) The Administrative Memorandum [sic] emphasizes that "GAF ratings are not standardized," explaining that

---

[7]Psychometrics is "1: a branch of clinical or applied psychology dealing with the use and application of mental measurement[;] 2: the technique of mental measurements:  the use of quantitative devices for assessing psychological trends."  <u>MedlinePlus Medical Dictionary</u> (Merriam-Webster, Inc. 2015), http://www.merriam-webster.com/medlineplus/psychometrics.

[8]A copy of the Commissioner's Administrative Message (not "Memorandum") AM-13066 is available at pp. 18-24 of the New York State Bar Association's seminar materials for "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (visited Mar. 12, 2015).

"GAF is neither standardized nor based on normative data. . . .  This limits direct comparability of GAF scores assigned by different evaluators. . . ." Id. at 3.  The Administrative Memorandum [sic] continues:

> Although the GAF rating is numerical, the actual number assigned can be misleading because the score does not quantify differences in function between people.  For example, a GAF score of 75 does not mean a person is functioning 10 units better than a person with a score of 65, nor does a GAF of 40 indicate a person is functioning half as well as a person with a score of 80.

Id. Additionally, it states that "GAF ratings assigned by different clinicians are inconsistent" and "adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation."  Id.

Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (quoting DSM-5).

Administrative Message AM-13066 notes that a GAF rating from an acceptable medical source is a medical opinion that the ALJ should consider and weigh with all the relevant evidence.

> However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to "raise" or "lower" someone's level of function.  The GAF is only a snapshot opinion about the level of functioning. . . .  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

AM-13066, ¶ E, at p. 22 of New York State Bar Association's "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489.

> Indeed, the previous version of the DSM specifically provided that the GAF assessment is made based on either the individual's symptoms or her functional impairments, whichever is lower.  DSM-IV-TR at 32-33 (emphasis added).  The Commissioner has determined the GAF scale "does

not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." 65 Fed. Reg. 50,746, 50,765-766 (Aug. 21, 2000).

Lane v. Colvin, No. C13-5658 MJP, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014).

"[A]ccordingly, it would be an error for an administrative law judge to focus on a doctor's assessed GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical evidence.  Simply put, an administrative law judge cannot draw a reliable inference from a single GAF score, standing alone." Martinez v. Colvin, No. 13-30124-KPN, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014).

Therefore, the ALJ in the instant case did not err by failing to mention the GAF scores assessed by Dr. Calhoun and Dr. Powanda, or by placing more reliance on both doctors' narrative opinions than on the assigned GAF scores.

Plaintiff contends that the ALJ should have incorporated into her assessment of his residual functional capacity Dr. Powanda's opinions that he has marked limitations in his ability to make judgments on simple work-related decisions and to respond appropriately to usual work situations and to changes in a routine work setting (Tr. 345-46), which does not support a finding that he can make simple work-related decisions and routine workplace changes.  The ALJ assigned only some weight to this part of Dr. Powanda's Medical Source Statement because the opinions were largely based on the statements of Locure and his mother, and because Dr. Powanda stated in her narrative

examination report that plaintiff exhibited no signs of psychosis, was fully oriented and was able to follow simple directions.  Locure contends that the ALJ erred in affording greater weight to the reports and opinions of his treating psychiatrist, Dr. Calhoun, because Dr. Calhoun did not render specific findings regarding plaintiff's functional abilities, as Dr. Powanda did.

The ALJ's summary of the medical evidence was thorough and accurate.  She cited and followed the appropriate legal standard when she weighed and resolved conflicts between Dr. Calhoun's and Dr. Powanda's opinions.  As the ALJ stated, the record as a whole does not substantially support the subjective complaints and functional limitations that Locure alleges result from his diagnosed mental conditions.

Locure testified that he did not receive any mental health treatment in prison because it was not available where he was incarcerated.  The Rayburn Correctional Center medical records contain no indication that he complained of or experienced any medically notable mental problems while in prison.

Plaintiff sought no treatment for mental health issues between his release from prison on November 28, 2011, and February 6, 2012, when he was admitted to the hospital on an emergency basis for suicidal ideation and possible audio hallucinations. After a few days of treatment, he improved and denied suicidal ideation and hallucinations.  He was discharged in stable condition on February 10, 2012, with a diagnosis of major depression with psychotic features.  (Tr. 283-85, 299-300).

Locure had follow-up treatment from the Metropolitan Human Services District. On February 22, 2012, Helene Greece (presumably a social worker) completed a psychosocial assessment and Erik Kramer (presumably a psychiatrist) conducted a psychiatric evaluation at Chartres-Pontchartrain Behavioral Health Center. (The medical records do not include designations of Greece's or Dr. Kramer's qualifications.) (Tr. 322-40). Locure reported to Greece that he had not taken any medications since his discharge from the hospital because he had received only prescriptions, not the medicines themselves. He said he was feeling bad, thinking "crazy things" and had disturbed sleep and both visual and audio hallucinations. He stated that he felt better when on medications. Greece observed that plaintiff exhibited paranoid ideation and a flat affect. (Tr. 322). She assessed him with a moderate risk of harm based on his history of suicidal behavior and a moderate impairment in functional status. (Tr. 331).

Dr. Kramer noted that Locure was cooperative and that his appearance, movements and thought processes were within normal limits. Plaintiff was not having hallucinations, delusions or suicidal ideation, but was withdrawn, anxious and depressed, and had a blunted, constricted affect. Dr. Kramer thought that plaintiff's risk of self-harm was low, his judgment and memory were intact and his insight was mildly impaired. (Tr. 338-39). Dr. Kramer diagnosed major depressive disorder, recurrent,

severe with psychotic features, and history of crack and amphetamine dependence, none in three years.  (Tr. 340)  He prescribed venlafaxine ER[9] and Zyprexa.[10]  (Tr. 341).

Locure was subsequently treated by Dr. Calhoun, who opined at each visit in March, May and June 2012 that plaintiff had mild symptoms.  In May and June, Dr. Calhoun observed that Locure was "much improved" with his treatment.  Although his diagnosis continued to be major depressive disorder, recurrent, with psychotic episode, Dr. Calhoun noted that Locure's memory was intact and his concentration, judgment and insight were good.  By June 20, 2012, plaintiff's mental status examination was within normal limits.  His mood was good without any reported psychological problems.  He was told to return in four weeks or as needed.  (Tr. 312-17).

Although there are no additional records of mental health treatment, Locure saw consultative examiner Dr. Powanda on October 12, 2012.  Dr. Powanda stated that plaintiff no longer took Effexor, but was taking amitriptyline[11] and olanzapine (generic Zyprexa) prescribed by Dr. Calhoun.  (Tr. 348).  Dr. Powanda observed that Locure was

---

[9]Effexor XR (generic name: venlafaxine) "is a medicine called a serotonin and norepinephrine reuptake inhibitor (SNRI).  It is used to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder in adults.  Effexor XR is an extended-release medicine . . . ."  PDRhealth,  http://www.pdrhealth.com/drugs/effexor-xr (visited Mar. 13, 2015).

[10]Zyprexa (generic name:  olanzapine) is used to treat schizophrenia.  It can also be used to treat bipolar disorder alone or in combination with other drugs, and to treat depression that has not improved after taking two other medicines. Id., http://www.pdrhealth.com/drugs/zyprexa (visited Mar. 12, 2015).

[11]Amitriptyline "belongs to a group of drugs called tricyclic antidepressants and is used to treat depression."  Id., http://www.pdrhealth.com/drugs/amitriptyline (visited Mar. 13, 2015).

appropriately groomed, maintained adequate eye contact, related appropriately to her and was not significantly restless, impulsive, easily distracted or irritable.  His speech was clear and adequately expressive.  He was able to follow oral test directions and maintain adequate sustained attention, persistence and effort.  He demonstrated adequate general knowledge, immediate memory and practical social judgment, but poor recall.  (Tr. 350).  Locure reported significant mood symptoms, including marked irritability, sleep and appetite problems, some hopelessness, occasional suicidal thoughts and hallucinations about one week earlier.  Dr. Powanda noted that he did not evince loose associations, circumstantial speech,[12] perseverations,[13] compulsions or paranoid ideation.  He had some insight into his problems and limited judgment.  She opined that plaintiff had no significant signs of psychosis and could follow simple verbal directions.  She stated that "[h]e and his mother reported that he has difficulty completing tasks."  Dr. Powanda concluded that Locure "has significant difficulty coping with life's stressors and adapting to change[, and] . . . would have significant difficulty making on the job decisions."  Dr. Powanda diagnosed mood disorder with psychotic features.  (Tr. 351).

---

[12]Circumstantiality is "a conversational pattern (as in some manic states) exhibiting excessive attention to irrelevant and digressive details."  MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/circumstantiality.

[13]Perseveration is "continual involuntary repetition of a mental act usually exhibited by speech or by some other form of overt behavior."  Id., http://www.merriam-webster.com/medlineplus/perseveration.

The well-supported opinions of the treating physician who is familiar with the claimant's impairments, treatments and responses should ordinarily be accorded great weight.  Newton, 209 F.3d at 455.  To the extent that Dr. Powanda's opinions are internally inconsistent or conflict with Dr. Calhoun's findings, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Id. (quotation omitted).

Locure argues that, in rejecting Dr. Powanda's opinions in favor of Dr. Calhoun's, the ALJ should have discussed each of the six factors in 20 C.F.R. § 404.1527(d)(2),[14] which plaintiff contends is required by Newton.  Such a discussion is not necessary because the instant case is distinguishable from Newton.  In that case, the Fifth Circuit held that the ALJ had erred by rejecting a treating physician's opinion in favor of a non-examining physician's without discussing the six factors.  Rollins v. Astrue, 464 F. App'x 353, 356 n.4 (5th Cir. 2012).  However, the Fifth Circuit "do[es] not require consideration of each of the factors set out in Newton where, as here, 'there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'"  Walker v. Barnhart, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting Newton, 209 F.3d at 458).  Although "the ALJ must articulate the weight given to medical opinions, a recount of specific findings is not necessary if

---

[14]The six factors are examining relationship, treatment relationship, supportability, consistency, specialization, and other factors.  Id.

the ALJ shows he considered the medical findings." Ciccotti v. Astrue, No. SA-09-CV-969-XR, 2010 WL 3022775, at *11 (W.D. Tex. July 28, 2010) (citing Thompson v. Astrue, 232 F. App'x 421, 424 (5th Cir. 2007)).

A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling. Muckelroy v. Astrue, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing Burnside ex rel. Burnside v. Bowen, 845 F.2d 587, 592 (5th Cir. 1988), abrogated on other grounds by Sullivan v. Zebley, 493 U.S. 521, 527 (1990)); Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); see also Bolton v. Apfel, 237 F.3d 632, 2000 WL 1701816, at *1 (5th Cir. Nov. 3, 2000) (affirming denial of benefits when, "[a]lthough the medical records reflect that Bolton did experience a single episode of severe depression, her depression responded to treatment and had apparently resolved by the time Bolton was examined by Dr. Greer.").

The medical evidence indicates that Locure responded well to treatment. Dr. Calhoun opined repeatedly that plaintiff's symptoms were mild and he was much improved. Dr. Calhoun placed no restrictions on his activities.

The ALJ, as she is obligated to do, weighed conflicting medical opinions and resolved the conflict in favor of Dr. Calhoun's opinions, which are supported to some extent by Dr. Powanda's observations in her narrative report regarding plaintiff's abilities to relate appropriately, concentrate and follow simple verbal directions. Escalante v.

Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)); see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").   On the other hand, Dr. Powanda's conclusions in her Medical Source Statement that Locure is markedly limited in his ability to make judgments on simple work-related decisions and to respond appropriately to usual work situations and to changes in a routine work setting are contradicted to some extent by both her own narrative report and Dr. Calhoun's statements.

The ALJ had good cause to afford Dr. Powanda's opinion less weight because it was based in large part on plaintiff's and his mother's reports of his symptoms and difficulty completing tasks.  Williams v. Colvin, 575 F. App'x 350, 355 (5th Cir. 2014); Barbee v. Barnhart, 54 F. App'x 406,  2002 WL 31688886, at *3  (5th Cir. Oct. 29, 2002); Greenspan v. Shalala, 38 F.3d 232, 237-38 (5th Cir. 1994); Kim Nguyen v. Colvin, No. 4:13-CV-2957, 2015 WL 222328, at *9 (S.D. Tex. Jan. 14, 2015).

The ALJ's decision shows that she carefully considered, but ultimately rejected, Dr. Powanda's conclusion that plaintiff was markedly limited in his ability to make judgments on simple work-related decisions and to respond appropriately to usual work situations and changes in a routine work setting.  "[T]he Act empowers the ALJ to

30

analyze the physicians' testimony.  Substantial evidence supports the ALJ's decision to disregard [Dr. Powanda's] conclusions.  That basis is enough to survive our review." Greenspan, 38 F.3d at 237.

"The record indicates that the ALJ used the medical information provided by [plaintiff] to determine the plaintiff's residual functional capacity for work. . . .  What [plaintiff] characterizes as the ALJ substituting [her] opinion is actually the ALJ properly interpreting the medical evidence to determine his capacity for work." Taylor, 706 F.3d at 602-03.  The ALJ's finding that plaintiff is capable of making simple, work-related decisions and routine workplace changes is substantially supported by the evidence. Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ's finding that plaintiff's history of burns is nonsevere is supported by substantial evidence.  Substantial evidence also supports the ALJ's findings that Locure is capable of making simple, work-related decisions and routine workplace changes.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[15]

New Orleans, Louisiana, this ___19th___ day of March, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[15]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.